UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA      CASE NO. 8:24 cr 258 SDM - AEp

vs.

18 U.S.C. § 2
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)

ROBERT DESSELLE

## INDICTMENT

The Grand Jury charges that:

JUN 7 2024 AMS:14
FILED - USDC - FLMD - TPA

### COUNT ONE
**(Conspiracy to Defraud the United States
and Pay and Receive Health Care Kickbacks)**

At all times material to this Indictment:

#### The Defendant and Relevant Entities

1.      The defendant, **ROBERT DESSELLE**, was a resident of Florida.
The defendant owned and controlled Desselle's Sky High Enterprise, LLC
d/b/a Sky High Enterprise ("Sky High"). Sky High was a limited liability
company formed under the laws of Florida with its principal place of business
located in Sarasota, Florida. Sky High utilized a Bank of America account
ending in x1852 ("Sky High Account").

2.      Co-Conspirator 1 was a resident of Louisiana. He owned and
controlled MK Promotions, LLC ("MK Promotions"), a limited liability

company formed under the laws of Louisiana with its principal place of business located in St. Tammany Parish, Louisiana.

3. Co-Conspirator 2 was a resident of Louisiana.

4. Co-Conspirator 3 was a resident of Alabama.

5. Co-Conspirator 4 was a resident of Alabama.

**The Medicare Program**

6. The Medicare Program ("Medicare") was a federally funded program that provided free and below-cost health care benefits to individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare & Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

7. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

8. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by

2

physicians, medical clinics, laboratories, and other qualified health care providers, including medical services such as office visits, minor surgical procedures, and laboratory testing that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

9.    Medicare "providers" included physicians, clinics, and other health care providers who provided items services to beneficiaries. To bill Medicare, a provider was required to submit a Medicare Enrollment Application Form ("Provider Enrollment Application") to Medicare. The Provider Enrollment Application contained certifications that the provider was required to make before the provider could enroll with Medicare. Specifically, the Provider Enrollment Application required the provider to certify, among other things, that the provider would abide by the Medicare laws, regulations, and program instructions, including the Federal Anti-Kickback Statute, and that the provider would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare.

10.    A Medicare "provider number" was assigned to a provider upon approval of the provider's Medicare Enrollment Application. A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

3

11.    A Medicare claim was required to contain certain important
information, including: (a) the beneficiary's name and Health Insurance Claim
Number ("HICN"); (b) a description of the health care benefit, item, or service
that was provided or supplied to the beneficiary; (c) the billing codes for the
benefit, item, or service; (d) the date upon which the benefit, item, or service
was provided or supplied to the beneficiary; (e) the name of the referring
physician or other provider; and (f) the referring provider's unique identifying
number, known either as the Unique Physician Identification Number
("UPIN") or National Provider Identifier ("NPI"). The claim form could be
submitted in hard copy or electronically.

12.    When submitting claims to Medicare for reimbursement, providers
were required to certify that: (1) the contents of the forms were true, correct,
and complete; (2) the forms were prepared in compliance with the laws and
regulations governing Medicare; and (3) the services that were purportedly
provided, as set forth in the claims, were medically reasonable and necessary,
provided as represented, and not procured through the payment of illegal
kickbacks and bribes.

13.    Medicare claims were required to be properly documented in
accordance with Medicare rules and regulations. Medicare would not

4

reimburse providers for claims that were procured through the payment of kickbacks and bribes.

### Cancer Genetic Testing

14.    Cancer genetic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

15.    Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." Title 42, Code of Federal Regulations, Section 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

16.    If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member,

5

Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

17.    Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

### Telemedicine

18.    Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

19.    Telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers. In

order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

20.    Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.

21.    In or around March 2020, in response to the COVID-19 pandemic and in order to enable access to care during the public health emergency, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

### The Conspiracy

22.    From in or around June 2018, and continuing through in or around December 2020, in the Middle District of Florida, and elsewhere, the defendant,

7

## ROBERT DESSELLE

did knowingly and willfully combine, conspire, confederate, and agree with
others known and unknown to the United States, to:

    a. defraud the United States by impairing, impeding, obstructing, and
defeating through deceitful and dishonest means, the lawful
government functions of HHS and CMS, in their administration
and oversight of Medicare;

    b. violate Title 42, United States Code, Section 1320a-7b(b)(1)(A), by
knowingly and willfully soliciting and receiving any remuneration,
including kickbacks and bribes, directly and indirectly, overtly and
covertly, in cash and in kind, in return for referring an individual
to a person for the furnishing and arranging for the furnishing of
CGx testing for which payment may be made in whole or in part
under a Federal health care program, that is, Medicare; and

    c. violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by
knowingly and willfully offering and paying any remuneration,
including kickbacks and bribes, directly and indirectly, overtly and
covertly, in cash and in kind, in return for referring an individual
to a person for the furnishing and arranging for the furnishing of

CGx testing for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

23.    It was a purpose of the conspiracy for **ROBERT DESSELLE** and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying kickbacks and bribes to marketers, including Co-Conspirator 3 and Co-Conspirator 4, in exchange for referring Medicare beneficiaries for CGx testing which was medically unnecessary and ineligible for reimbursement; (b) paying kickbacks and bribes to telemedicine companies to obtain orders for medically unnecessary CGx testing; (c) receiving kickbacks and bribes from laboratories in exchange for referring Medicare beneficiaries, including completed doctors' orders, to laboratories for CGx testing; (d) concealing and causing the concealment of the illegal kickbacks and bribes; and (e) diverting proceeds of the conspiracy for their own personal use and benefit, the use and benefit of others, and to further the conspiracy.

### Manner and Means

24.    The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

a. **ROBERT DESSELLE**, Co-Conspirator 1, Co-Conspirator 2, and others arranged for marketers, including Co-Conspirator 3 and Co-Conspirator 4, to visit businesses with high foot traffic, such as grocery stores, pharmacies, or car dealerships to recruit vulnerable Medicare beneficiaries for CGx testing.

b. **ROBERT DESSELLE**, Co-Conspirator 1, Co-Conspirator 2, and others arranged for marketers, including Co-Conspirator 3 and Co-Conspirator 4, to use deceptive marketing techniques to recruit vulnerable Medicare beneficiaries, including wearing white lab coats to appear like a medical professional, when in fact the conspirators and marketers with whom they contracted were not medical professionals.

c. **ROBERT DESSELLE**, Co-Conspirator 1, Co-Conspirator 2, and others arranged for marketers, including Co-Conspirator 3 and Co-Conspirator 4, to screen patients for Medicare coverage and record their medical histories in a way to make it falsely and fraudulently appear as if the Medicare beneficiary qualified for CGx testing when, in fact, they did not.

d. **ROBERT DESSELLE**, through Sky High, paid illegal kickbacks and bribes to Co-Conspirator 1 and Co-Conspirator 2 in exchange for referring beneficiaries for CGx testing.

e. **ROBERT DESSELLE**, Co-Conspirator 1, and Co-Conspirator 2, through Sky High, paid illegal kickbacks and bribes to marketers, including Co-Conspirator 3 and Co-Conspirator 4, in exchange for referring beneficiaries for CGx testing.

f. **ROBERT DESSELLE**, through Sky High, concealed and disguised the scheme by entering into sham contracts and agreements, including by drafting and executing contracts with marketers that falsely reflected that Sky High would pay them an hourly wage, when, in fact, marketers were paid illegal kickbacks and bribes for each beneficiary referred for CGx testing.

g. **ROBERT DESSELLE**, through Sky High, paid illegal kickbacks and bribes to a telemedicine company in exchange for ordering and arranging for the ordering of CGx testing for beneficiaries.

h. **ROBERT DESSELLE**, through Sky High, then referred the beneficiaries, along with the completed doctors' orders, to laboratories and their intermediaries, in exchange for illegal kickbacks and bribes.

11

i. **ROBERT DESSELLE** caused the submission of false and
fraudulent claims to Medicare that resulted in the payment of $4.5
million to various laboratories for CGx testing that was procured
through the payment of illegal kickbacks and bribes, ineligible for
Medicare reimbursement, medically unnecessary, and not
provided as represented.

**Overt Acts**

25.   In furtherance of the conspiracy, and to accomplish its objects and
purpose, at least one co-conspirator committed and caused to be committed, in
the Middle District of Florida, at least one of the following overt acts, among
others:

a. On or about January 9, 2020, **ROBERT DESSELLE** paid illegal
kickbacks and bribes to Co-Conspirator 2, through Sky High, in
the approximate amount of $3,000 in exchange for recruiting and
referring Medicare beneficiaries for CGx testing.

b. On or about February 19, 2020, **ROBERT DESSELLE** paid
illegal kickbacks and bribes to Co-Conspirator 4, through Sky
High, in the approximate amount of $7,000 in exchange for
recruiting and referring Medicare beneficiaries for CGx testing.

c. On or about March 24, 2020, **ROBERT DESSELLE** paid illegal kickbacks and bribes to Co-Conspirator 1, through Sky High and MK Promotions, in the approximate amount of $3,420 in exchange for recruiting and referring Medicare beneficiaries for CGx testing.

All in violation of Title 18, United States Code, Section 371.

### COUNTS TWO – FOUR
**(Payment of Health Care Kickbacks)**

26.     Paragraphs 1 through 22 of Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

27.     On or about the date set forth below in each count, in the Middle District of Florida, and elsewhere, the defendant,

**ROBERT DESSELLE,**

did knowingly and willfully offer and pay remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, as set forth below, to any person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part under a Federal health care program, that is Medicare, as set forth below:

| Count | Approx. Date of Kickback Payment | Approx. Kickback Amount | Description of Kickback Payment |
|---|---|---|---|
| TWO | January 9, 2020 | $3,000 | A wire transfer from the Sky High Account to Co-Conspirator 2 |
| THREE | February 19, 2020 | $7,000 | A wire transfer from the Sky High Account to Co-Conspirator 4 |
| FOUR | March 24, 2020 | $3,420 | A wire transfer from the Sky High Account to Co-Conspirator 1 |

Each in violation of Title 42, United States Code, Section 1320a-7(b)(2)(A) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATIONS

1.  The allegations contained in Counts One through Seven are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 982(a)(7).

2.  Upon conviction of a violation of Title 18, United States Code, Section 371, or a violation of or criminal conspiracy to commit a violation of Title 42, United States Code, Section 1320a-7b, the defendant shall forfeit to the United States, any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

14

3.      The property to be forfeited as to defendant **ROBERT DESELLE** includes, but is not limited to, the approximately $2,116,398 in proceeds obtained as a result of the commission of the offense.

4.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).


A TRUE BILL,


_____

FOREPERSON

ROGER B. HANDBERG
United States Attorney

GLENN S. LEON
Chief, Fraud Section
Criminal Division, Department of
Justice

Charles Strauss
Trial Attorney
United States Department of Justice
Criminal Division, Fraud Section

Rachelle DesVaux Bedke
Assistant United States Attorney
Chief, Economic Crimes

16

No.

# UNITED STATES DISTRICT COURT
## Middle District of Florida
### Tampa Division

## THE UNITED STATES OF AMERICA

vs.

## ROBERT DESSELLE

## INDICTMENT

Violations:   18 U.S.C. § 2
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)

A true bill,

Foreperson

Filed in open court this <u>6th</u> day

of June 2024.

_____   **KARINA NIEVES**
Clerk

Bail $_____